## CALIFORNIA RICE INDUSTRY v. FEDERAL TRADE COMMISSION.

### No. 8844.

Circuit Court of Appeals, Ninth Circuit.
March 17, 1939.

MATHEWS, Circuit Judge, dissenting.

Harry M. Creech, of San Francisco, Cal., for petitioners.

W. T. Kelley, Chief Counsel, Martin A. Morrison, Asst. Chief Counsel, Daniel J. Murphy and James W. Nichol, Sp. Attys., Federal Trade Commission, all of Washington, D. C., for respondent.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is a petition to review and set aside an order of the Federal Trade Commission requiring petitioners to "cease and desist, in connection with offering for sale, sale and distribution of rice and rice products in commerce as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C.A. § 44, from doing and performing by agreement, combination or conspiracy between or among any two or more of said respondents [petitioners here], or with others, the following acts and things:

"1. Fixing and maintaining uniform prices.

"2. Compiling, publishing and distributing any joint or uniform list or compilation of prices.

"3. Adopting any joint or uniform price list or other device which fixes prices.

"4. Discussing through the medium of meetings of the California Rice Industry or its Marketing and Crop Boards, or in any similar manner, uniform prices, terms, discounts, agreements upon prices, by resolution or otherwise, or employing any similar device which fixes or tends to fix prices, or which is designed to equalize or make uniform the selling prices, terms, discounts or policies of respondent millers.

"5. Fixing or determining the quotas or percentages of the rice crop that the miller respondents may mill or process which, thereby, unlawfully restricts or hinders the sale of rice or rice products in interstate commerce.
* * * ."

The California Rice Industry is a voluntary unincorporated association. It does not have officers or directors, neither does it have articles of organization, constitution or by-laws, except the Intrastate Marketing Agreement dated August 28, 1935, which created it. Organized within the association and controlling and administering its policies and activities are the Crop Board and the Marketing Board. The Agreement provides for a Crop Board composed of members selected by Rice Growers Association of California, Paddy Rice Growers of California, Independent Rice Growers, the latter being growers unorganized except for purposes of the Intrastate Marketing Agreement, and members selected by joint action of the first and last named organizations. Some of the rice growers who are members of the Crop Board were made respondents by the Federal Trade Commission and all such respondents are petitioners here. The Marketing Board is composed of members selected by the Rice Growers Association of California, a grower and miller cooperative, and by those others signatory to the Intrastate Marketing Agreement engaged in the State of California in milling rice or marketing rice. Some of the individuals who have constituted the Marketing Board were made respondents by the Federal Trade Commission and all such respondents are petitioners here. Harry M. Creech, for many years counsel for the Rice Growers Association of California and later attorney in the drafting and

execution of the Intrastate Marketing Agreement, is the neutral non-voting chairman of the Marketing Board, neutral non-voting member of the Crop Board and attorney for the California Rice Industry. The ·Federal Trade Commission included him as a respondent and he is a petitioner here. In addition to the above individuals, the Federal Trade Commission also included as respondents all but two of the various individuals, firms, corporations and cooperatives who signed the Intrastate Marketing Agreement. They are petitioners herein.

Substantially all of the rice produced within the State of California is of a shorter and plumper grain than the medium and longer grained rices produced in other sections of the United States. This rice, as grown and milled in California, is known as California-Japan type and the petitioners include or represent substantially everyone in California so engaged.

■ The petitioners' brief admits that "Substantially all of such rice after milling is sold and delivered by those among petitioners engaged cooperatively or commercially in milling rice *and some part is shipped by such millers into other States and Territories.*" (Emphasis supplied.) About half the rice grown and milled in California is shipped to Hawaii, about a quarter of the remainder is shipped to Puerto Rico and the balance is sold in California and in various other states of the United States.

There is a long established preference for this type of rice in Hawaii, where but a relatively small amount of other rice is imported from Japan and the southern states. Also in Puerto Rico it is a preferred type, commanding a higher price than other types of rice sold there. The Commission properly may have inferred that its peculiarly plump characteristics have found consumers in other states who prefer it. It is obvious that the price of such a food, having such preferring consumers, will be affected if all competition of its suppliers is eliminated. Such evidence tends to support the Commission's finding of ultimate fact (though stated as a conclusion) that "2. As a result of the respondents entering into and making effective the agreement as above described, competition in the sale of rice and rice products in commerce as hereinabove referred to has been restricted and suppressed."

In addition to the admission of interstate shipments above italicized, the California-Japan type rice is sold by petitioners under sales contracts "fob cars" at the mill or "fob dock" at San Francisco, most of which is destined for points outside the state. The loading "on board" the cars or the car or truck movement from the rice mill to the dock, constitutes the beginning of the interstate or foreign transit. Thus there are sales contracts, in which it is found to be the practice of petitioners to charge uniform, fixed prices, which, as well as the delivery to the buyers, are "in" interstate or foreign commerce. Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 290, 291, 42 S.Ct. 106, 66 L.Ed. 239; Addyston Pipe & Steel Co. v. U. S. 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136; U. S. v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 298, 46 L.R.A. 122; U. S. v. United Shoe Machinery Co., D.C. E.D. Mo., 234 F. 127, 144; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 463, 58 S.Ct. 656, 82 L.Ed. 954; Pennsylvania R. Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 468, 35 S.Ct. 896, 59 L.Ed. 1406. Cf. Federal Trade Comm. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534, where intrastate price list was held a price factor in interstate transactions.

These facts establish that the acts interdicted by paragraphs "1" to "4" inclusive of the Commission's order are "in" interstate commerce and hence satisfy that requirement of the Federal Trade Commission Act.

The Commission's complaint was issued on March 26, 1937. The relevant portions of Section 5 of the Federal Trade Commission Act as it then read (Act of September 26, 1914, c. 311, 38 Stat. 717, 719-720; U.S.C.1934 ed., Title 15, § 45, 15 U.S.C.A. § 45) are:

"Sec. 5. That unfair methods of competition in [interstate and foreign] commerce are hereby declared unlawful.

"The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, * * * from *using unfair methods of competition* in [interstate and foreign] commerce.

"Whenever the commission shall have reason to believe that any such person, partnership, or corporation has been or is *using any unfair method of competition* in commerce, and if it shall appear to the

commission that a proceeding by it in respect *thereof would be to the interest of the public,* it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect * * * ." (Emphasis supplied.)

The questions remain whether the acts prohibited by paragraphs "1" to "4" inclusive of the Commission's order come within the class of "unfair methods of competition" in such commerce and whether their prevention "would be to the interest of the public", as these terms are used in Section 5 of the Act.

The Commission has found the sales are at a uniform fixed price, the same for each petitioner, and that the uniformity is attained by a price fixing agreement among the petitioners. It has been found that: "At meetings held on Tuesday of each week the Marketing Board from time to time, and with the concurrence of the Crop Board, fixes an industry price for extra-fancy clean rice, and from this price, by use of a formula adopted by said Marketing Board, the base price, producer's price, and trade prices for all grades of processed rice are computed."

The price fixing clauses of the Agreement provide with relation to the "industry price", from which by use of a formula the price at which rice is to be offered for sale is computed, that "by vote of either the Marketing Board or the Crop Board in the manner hereinafter provided, Industry Prices fob dock San Francisco for Extra Fancy clean rice of types produced in California shall be the simple average of the price for Extra Fancy Blue Rose rice at New Orleans for the ten preceding weeks as reported by the Federal-State Marketing News Service in its official Rice Market Review, provided that if more than one price is reported for any week then the price used in the average shall be the mid-point between the high and low so reported, plus ten cents per bag in the case of California Japan type or thirty-five cents per bag in the case of any other type, * * * ."

The brief of petitioners admits the effectiveness of fixing the uniform prices above the arbitrarily set New Orleans market price of another rice, and compares the result with that of the prior free competition and emphasizes the benefit to the miller-vendors and, it claims, to the growers as well. The probability is that no such agreement would have been made to fix the price for the small remainder sold in California to California buyers.

 The total volume of the annual crop of rough or "paddy" California-Japan type rice grown in California is about 3,000,000 bags, which is equivalent to 1,500,000 bags of clean rice. We take judicial notice of the public interest involved in the elimination of all price competition by a group of sellers to the public of substantially the entire supply of such a volume of one of the preferred staple foods. Since Section 5(c) of the Act 15 U.S.C.A. § 45(c), empowers us to make final disposition of the case upon the "pleadings, evidence and proceedings"[1] no specific finding by the Commission is required of a fact so judicially known.

All the growers, processors, and sellers in interstate and foreign commerce, of the California-Japan type rice, here appearing, are satisfied with such a control of prices. There is no evidence of dissatisfaction by other growers. Hence this part of the review narrows itself to the question whether the agreed elimination of competition in price fixing is an "unfair method of competition" as that phrase is used in Section 5 of the Act.

Each of the petitioners is a potential competitor of each other in the sale of this food of the common people. This potential competition is prevented not only by the mutual promises of the millers but by the sanction of a substantial fine on any miller violating the agreement by selling his rice at a price less than that fixed by the Marketing Board. The fine is collected from a Millers' Trust Fund created by the Agreement.[2]

---

[1] Federal Trade Comm. v. Curtis Publishing Co., 260 U.S. 568, 580, 43 S.Ct. 210, 67 L.Ed. 408. Cf. Hills Bros. v. Federal Trade Comm., 9 Cir., 9 F.2d 481, 483, 484.

[2] "Article IV. Millers' Trust Fund
"1. Each Miller on or before the 10th of the first full calendar month next following the execution hereof and on or before the 10th day of each month thereafter, shall pay into the Millers' Trust Fund ten cents for each bag of paddy processed by it in the month preceding, plus ten cents for each bag of paddy processed by it during the said preceding month in excess of its quota. If any Miller fails to make the required payment by the 16th of the month in which such payment is due, he shall pay an ad-

It is obvious that the consumers of this food will be most unlikely to receive the benefit which, under competition, would flow to them in the form of lower prices charged by miller-vendors whose costs are less than those of competitors, because of improved mechanical processes, higher managerial or operating efficiency, or advantageous location with respect to transportation costs.

■ This deprivation of benefit to the consumer resulting from lower costs of the more efficient miller-vendors arises from the fact that no higher cost miller-vendor of rice would join in the combination to fix the price unless the price be one advantageous to it. That is to say, the strong tendency in any such combination is to fix a price making a profitable return on the rice to the particular miller-vendor which has the highest production cost at the point of sale. In addition is the pressure, always present with a monopoly controlling the supply of a particular product preferred by consumers, to raise the price to a point which affords an unreasonable profit to all members composing the group of monopolizing suppliers. The success of the price as fixed by the Agreement may lead to a revision of its method of price fixing and a higher price agreed on. One of the purposes of the Act is "to stop in their *incipiency* those methods of competition which fall within the meaning of the word 'unfair.' " Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 647, 51 S.Ct. 587, 590, 75 L.Ed. 1324, 79 A.L.R. 1191. (Italics supplied.)

■ Prior to the Agreement, the petitioners were competing with one another for food customers' patronage. This normal economic condition is what the Congress has created the Federal Trade Commission to aid in maintaining.

. The Agreement has destroyed the freedom to compete by the sanction of the fine on any one of the price fixers who may seek at any time a greater economic advantage because of his superior energy, ability and resources to process more than his permitted quota of the crop of rice and make larger sales at smaller profits. Each petitioner is a potential competitor who, if freed, would renew the desired norm of free competition with the others. That is to say, each petitioner, through the price fixing Agreement, prevents each other from the free use of his economic power and ability. It is the "potential" as well as the immediate competitor whose competition the Act seeks to keep free. Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 651, 51 S.Ct. 587,

ditional five cents per bag for all paddy processed during said preceding month. In computing the amounts payable under this paragraph, there shall be deducted all amounts similarly payable in any other Marketing Agreement for the California Rice Industry to which the parties hereto are signatory.

"2. Expenses deemed necessary by the Marketing Board and incurred incident to the performance by the Marketing Board of its functions and duties hereunder shall be paid from the Millers' Trust Fund.

"3. On October 1, 1936, and on October 1 of each year thereafter, or upon any interim termination of this Agreement, the Millers' Trust Fund, after deducting accrued expenses in accord herewith, shall be distributed to the respective Millers in the same percentages as their normal volume percentages, except that a Miller who has exceeded his total quota for the preceding twelve months shall receive only one-half of his normal volume percentage of the amount contributed by him for such excess.

"4. By sixty percent affirmative vote presenting at least three members of the Marketing Board, partial distributions of the Millers' Trust Fund may be made not exceeding in the aggregate fifty percent of the total collections to any given date, nor more frequently than at monthly intervals.

\* \* \* \* \* \*

"Article XII. Enforcement

\* \* \* \* \* \*

"3. If at any time it is found by the Marketing Board, after due notice, hearing and determination under procedure as prescribed by the Marketing Board, that a Miller has failed or is failing to abide by, or has violated or is violating any provision of this Agreement, or any sales terms, rules, regulations or policies prescribed by the Marketing Board pursuant hereto, the Marketing Board shall cause to be deducted from such Miller's share in the Millers' Trust Fund as damages a sum or sums not exceeding four times the profit estimated by the Marketing Board, if any, realized by such Miller in the transaction in respect of which such default or violations occurred, and no such deduction for such default or violations shall in any event be less than five hundred dollars. All sums thus deducted shall be distributed to the other Millers in proportion of their respective normal volume percentages.

\* \* \* \* \* \*.''

75 L.Ed. 1324, 79 A.L.R. 1191; Federal Trade Comm. v. Klesner, 280 U.S. 19, 28, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838.

■ We take judicial notice that potentially there are many other competitors— persons not parties to the Agreement— who may acquire rice from California's existing and expanding rice fields. Against such outside competition, here again, each price-fixer, through the Agreement, hamstrings each other price-fixer in the free exercise of his energy and economic power. The single price ·as here fixed makes it impossible for him to meet the day to day changes of a free market. The acts interdicted by the Commission certainly are methods of competition, unfair both to the petitioners and the consumers of the food, if a "fair field and no favors" is the condition sought to be protected by the Federal Trade Commission Act.

■ There is no question that a destruction by the use of economic power by one interstate vendor of the freedom of his competitor's trade, if not accomplished by a contract or other combination with the latter, would warrant the Commission's order to cease and desist. However, it is contended that since petitioners have by an agreement eliminated price competition in the California-Japan type rice, and it has proved profitable to them, and, since each is dealing with his own property, there is no "unfair method of competition" involved in each preventing the other from a free competition with one or more of the agreeing parties which would destroy any price fixing profit, or in preventing one or more of them from competing with an outsider whom the price-fixers are not able to persuade to join them.

We do not so narrow the meaning of the phrase "unfair method of competition". We regard Congress to have used the preposition "of" in the broader sense stated in the dictionaries as meaning "associated with" or "connected with" or "pertaining to" and the word "competition" in a broad sense covering the whole field of competition. That is to say, we construe the phrase as meaning an "unfair method pertaining to the maintenance of competition".

■ This construction of the phrase accords with the purpose of the Act as repeated in identical language in several opinions of the Supreme Court. A method is "an unfair method of competition" if it does not leave to each actual or potential competitor a "fair opportunity" for the play of his contending force engendered by an honest desire for gain. "The great purpose of both statutes [Federal Trade Commission and Clayton Acts, 15 U.S.C.A. § 41 et seq.; 15 U.S.C.A. § 12 et seq.] was to advance the public interest by securing *fair opportunity* for the play of the contending forces ordinarily engendered by an honest desire for gain. And to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs." (Emphasis supplied.) Federal Trade Comm. v. Sinclair Ref. Co., 261 U.S. 463, 476, 43 S.Ct. 450, 454, 67 L.Ed. 746; International Shoe Co. v. Federal Trade Comm., 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431; Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 647, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191.

■ The Supreme Court in Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534, has so treated the phrase in sustaining the Commission's cease and desist order to associations of paper sellers in interstate commerce who, by agreement and understanding, had divided the Pacific Coast states into regional areas where they sold 75 percent of the paper and paper products, other than newsprint, there consumed. Each local association distributed uniform price lists to its members to be observed in its territory within the state. The secretary of each was authorized to investigate complaints against members to determine whether they sold below the established prices; and three of the associations authorized the imposition of heavy fines on members for making such sales. These association lists were habitually carried and used by the salesmen of members in quoting prices and making sales outside the state. No association had any requirements that such price lists be observed outside the state; and the quoting of, or the making of sales at, lower or different prices in such territory was not deemed an infraction of rules or trade regulations by reason of which any jobber or wholesaler could complain. Referring to the prices fixed by the local associations, the Commission said the habitual carrying and use of such price lists by member jobbers in quoting prices and making sales outside the state, had a natural tendency to and did limit and lessen competition therein, and

the result of such practice was fixed and uniform prices for such products within such territories.

Paragraph (b) of the Commission's order was to prevent the local associations, their officers and members, separately or in combination, from using any price list fixed by agreement between wholesalers in soliciting or selling in interstate commerce, and from making and distributing any such price list intended for use in making such sales.

This court held that the order to cease and desist the use of the common price list should be reversed because there was no showing that there was a "combination" of the dealers for such use. This court stated that such a combination would bring the price-fixing within the order of the Commission. Pacific States Paper Trade Ass'n v. Federal Trade Comm., 9 Cir., 4 F.2d 457, 460.

In reversing this court and deciding to be valid the cease and desist order of the Commission because the facts justified a finding of such a price-fixing combination, the Supreme Court held: "The weight to be given to the facts and circumstances admitted as well as the inferences reasonably to be drawn from them is for the Commission. *Its conclusion that the habitual use of the established list lessens competition and fixes prices in interstate territory* cannot be said to be without sufficient support. Paragraph (b) does not go beyond what is justified by the findings. It is valid." (Italics supplied.) Federal Trade Comm. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534.

Here were no findings of a method of competition unfair or harmful to any *competing* paper-seller outside the combination. neither the Supreme Court nor the Commission considered relevant the question whether the sellers of the 25 percent outside the combination were damaged by its price-fixing. The reasoning of the opinion would apply a fortiori if 100 percent instead of 75 percent of the paper business had been controlled by the combination and it had changed the prior actual competitors into no more than potential competitors restrained by the agreement.

In the paper associations, as in the Rice Industry here, no member of the combination was found injured in his profits by the restraint of the combined members. It it obvious that it was the harm by destroying a "fair opportunity" for competition among themselves and *to the public* from the "fixed and uniform prices" established by the combination which made unfair this method of restraining competition. We hold paragraphs "1" to "4" inclusive of the Commission's order to be valid.

It is suggested that construing the so-called Intrastate Agreement as controlling interstate shipments and prices, it does no more for the rice industry than is permitted by the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq. There was a so-called Interstate Marketing Agreement of which the Secretary of Agriculture was a signatory, made prior to the agreement here involved, but the Secretary of Agriculture subsequently withdrew his approval. Congress has created in the Agricultural Adjustment Act a mechanism permitting the elimination of certain competitive factors in interstate commerce in agricultural products but, in the absence of a government control of such a regulated economy, competition cannot be impaired by such an agreement as that of petitioners.

With regard to paragraph "5" of the Commission's order directed against the fixing or determining of quotas of the petitioners in rice milling,[3] this enterprise,

---

[3] The so-called Intrastate Marketing Agreement provides:

"Article III. Processing Quotas.

"1. The Marketing Board shall promptly determine from all available statistical information and state in terms of percentages of the total annual shipment, the proportionate shipment of California rice by calendar months. These percentages will hereinafter be referred to as 'normal monthly demand percentages'.

"2. The Marketing Board shall on October 1, 1935, and on October 1, of each year thereafter, so long as this Agreement shall be in effect, estimate the total available supply of rice for the ensuing year and apply it to the 'normal monthly demand percentages' to determine the estimated monthly volume for the ensuing year.

"3. Each month the Marketing Board shall determine a processing quota for each Miller of the estimated monthly volume for the succeeding month by applying each Miller's normal volume percentage to the estimated volume for said

like mining in the Carter Coal case, is not commerce and is intrastate in character. Carter v. Carter Coal Co., 298 U.S. 238, 299, 317, 56 S.Ct. 855, 80 L.Ed. 1160.

Undoubtedly the fixing of such quotas "affects" the volume of rice which after milling is sold and delivered into interstate commerce, but unlike the National Labor Relations Act[4] the Federal Trade Commission Act does not create a control in the Commission of practices both "affecting" interstate commerce and "in" interstate commerce. Since the Commission's authority is confined to transactions "in" interstate commerce, paragraph "5" of its order to cease and desist from "fixing or determining the quotas or percentages of the rice crop that the Miller respondents may mill or process * * *" is beyond its jurisdiction and void.

The Commission's order is affirmed as to paragraph "1" to "4" inclusive and reversed as to paragraph "5" thereof.

After the issuance of the complaint on March 26, 1937, the Act was amended prescribing as a remedial measure that to the extent that the order of the Commission is affirmed, this court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. (15 U.S.C.A. § 45(c). Such an order of this court will be issued.

MATHEWS, Circuit Judge (dissenting).

This is a petition to review and set aside an order issued by the Federal Trade Commission. Petitioners are California Rice Industry (an unincorporated association), members of the association (hereafter called the millers),[1] members of the association's marketing board[2] and members of its crop board.[3] The order requires petitioners to "cease and desist, in connection with offering for sale, sale and distribution of rice and rice products in commerce as defined in Section 4 of the Federal Trade Commission Act,[4] from doing and performing by agreement, combination or conspiracy between or among any two or more of [petitioners], or with others, the following acts and things:

"1. Fixing and maintaining uniform prices.

"2. Compiling, publishing and distributing any joint or uniform list or compilation of prices.

"3. Adopting any joint or uniform price list or other device which fixes prices.

"4. Discussing through the medium of meetings of the [association] or its Marketing and Crop Boards, or in any similar manner, uniform prices, terms, discounts, agreements upon prices, by resolution or otherwise, or employing any similar device which fixes or tends to fix prices, or which is designed to equalize or make uniform the selling prices, terms, discounts or policies of [the] millers.

"5. Fixing or determining the quotas or percentages of the rice crop that the [millers] may mill or process which, thereby, unlawfully restricts or hinders the sale of rice or rice products in interstate commerce."

---

succeeding month, and adding such Miller's unused volume, if any, of the two months next preceding. A quota shall include and apply to all rice milled whether on toll or otherwise.
* * *."

[4] 49 Stats. 449, 450, 453, Sec. 2(6) and (7) and Sec. 10(a), 29 U.S.C.A. § 152(6) and (7) and § 160(a).

[1] Charles S. Morse, Allen A. Morse, Nelson B. Morse, Clarence G. Morse and Gertrude Morse, trading as Capital Rice Mills; Ellen S. Grosjean and Eileen Callaghan, trading as C. E. Grosjean Rice Milling Company; Growers Rice Milling Company, a corporation; Pacific Trading Company, a corporation; Phillips Milling Company, a corporation; Rice Growers Association of California, a corporation; Rosenberg Brothers & Company, a corporation; and William Crawford, trading as Woodland Rice Milling Company.

[2] George W. Brewer, William Crawford, Harry M. Creech, Florence M. Douglas, Charles S. Morse, J. S. Ritterband, W. T. Welisch, I. Yamakawa and O. F. Zebal.

[3] Hugh Baber, Leon Brink, Harry M. Creech, N. F. Dougherty, Ernest Grell, Lewis Manor, R. A. Renaud and A. E. Scarlett.

[4] 38 Stat. 719, 15 U.S.C.A. § 44. By this section, "commerce" is defined as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation."

724

The order was issued on March 26, 1938, in a proceeding under § 5 of the Federal Trade Commission Act.[5] Hence, the Commission's authority to issue the order must be found, if at all, in § 5, as it existed on that date.[6] Section 5, as it then existed, declared that unfair methods of competition in commerce[7] were unlawful. It empowered and directed the Commission to prevent persons, partnerships or corporations, except banks and common carriers subject to the Interstate Commerce Act, from using such methods of competition. To that end, it provided: "Whenever the commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition in commerce, and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect, and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. * * * If upon such hearing the commission shall be of the opinion that the method of competition in question is prohibited by this Act [chapter], it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition. * * *"

Then, as now, § 5 empowered this court, upon petition of either party, to review and affirm, modify or set aside any such order, and provided that, upon such review, the Commission's findings as to the facts, if supported by testimony, should be conclusive.

Section 5, as it then existed, did not empower the Commission to prevent, or to require anyone to cease or desist from, any act or thing except the use of an unfair method of competition in commerce. The order here under review does not purport to be an order preventing, or requiring petitioners to cease or desist from using, any such method of competition. It says nothing about competition or methods of competition.

There is no finding, nor any evidence which would warrant a finding, that petitioners have any competitors, actual or potential. On the contrary, it appears from the findings that the millers—who, so far as shown, are the only petitioners engaged in any business—are engaged in the business of milling, in the State of California, a particular type of California-grown rice and in the business of selling and distributing such California-grown, California-milled rice in interstate commerce and in commerce between the State of California and the Territories of Hawaii and Puerto Rico, and that no one else is similarly engaged. Whether anyone else desires to, or could under any circumstances, engage in either of these businesses, the record does not show. Since, from the record, petitioners do not appear to have any competitors, actual or potential, they cannot, I think, be said to be using any unfair method of competition. Federal Trade Commission v. Raladam Co., 283 U.S. 643, 646–654, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191.

The conclusion just stated is not inconsistent with Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534.[8] The respondents in that case were wholesale paper dealers and trade associations of which they were members. The respondent dealers constituted a majority, but not all, of the wholesale paper dealers in the Pacific Coast States and had 75%, but not all, of the wholesale paper business in that region.[9] In their business, the respondent dealers had actual as well as potential competitors. They had, as actual competitors, wholesale dealers who were not members of the association, paper manufacturers

---

[5] 38 Stat. 719, 15 U.S.C.A. § 45.

[6] With the amendment of June 23, 1938, 52 Stat. 1028, 15 U.S.C.A. § 45, we are not here concerned.

[7] See footnote 4.

[8] Reversing, in part, Pacific States Paper Trade Ass'n v. Federal Trade Commission, 9 Cir., 4 F.2d 457.

[9] 273 U.S. page 59, 47 S.Ct. 255.

who sold direct to the retail trade, and paper brokers who negotiated such sales.[10] In that competition, the respondents used methods which the Supreme Court held were unfair methods of competition.

If, in the Pacific States case, the respondents had had no competitors, actual or potential, the Supreme Court, undoubtedly, would have applied in that case the doctrine which, subsequently, it applied in the Raladam case—that one who has no competitors cannot be said to be using an unfair method of competition.

The order should be set aside.

