**CENTRAL VERMONT RAILWAY, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 2713.**

United States District Court
D. Vermont.

March 7, 1960.

Horace H. Powers, St. Albans, Vt. (J. Raymond Hoover, Washington, D. C., J. Edgar McDonald, New York City, William H. Parsons, Washington, D. C., John F. Reilly, New York City, of counsel), for plaintiffs.

Robert W. Ginnane, Gen. Counsel; H. Neil Garson, Associate Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

Robert A. Bicks, Acting Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Louis G. Whitcomb, U. S. Atty. for Vermont, Rutland, Vt., for United States.

John D. Carbine, Rutland, Vt., E. B. Ussery, Columbia, S. C. (Harvey L. Golden, Joseph J. Lipton, Columbia, S. C., of counsel), for intervenors.

Before WATERMAN, Circuit Judge, and FOLEY and GIBSON, District Judges.

WATERMAN, Circuit Judge.

Ninety-one railroads [1] join in this action to enjoin and annul certain orders of the Interstate Commerce Commission,[2] entered pursuant to a decision of the full Commission reported at 303 ICC 743 (May 7, 1958). A single question is presented to this court: Does the Commission have jurisdiction over the foreign factor of a combination international rate when the foreign factor is a proportional rate from the points of origin to a border interchange within the United States?

[1.] Originally ninety-eight railroads joined as plaintiffs. However, on April 6, 1959, Judge Gibson issued an order permitting seven southern railroads to withdraw.

[2.] Two orders are attacked. They are an Order dated May 7, 1958 that required the railroads to cease and desist from exacting rates held to be unreasonable and prejudicial in the Commission's decision of the same date; and an Order dated February 19, 1959, that amended the effective date of the May 7, 1958 Order.

The rates in question pertain to the carriage of asbestos, a transportation originating in the Province of Quebec, Canada, and terminating at various points in North and South Carolina. The principal source of asbestos for United States manufacturers of asbestos products is a narrow belt of land in southern Quebec extending northeast and southwest approximately fifty miles west of the Maine border. Railroad appears to be the principal method of transporting this asbestos to its American users. The asbestos area of southern Quebec is served by two Canadian railroads, the Canadian National and the Quebec Central. Asbestos intended for consignees in the southern-Atlantic states is carried by the Canadian lines to East Alburg, Vermont, and Newport, Vermont (points respectively 3 and 5 miles south of the international boundary) where the cars are turned over to American railroads in an "interchange" operation. Customs inspection on incoming railroad freight occurs at East Alburg and at Newport; and, to that extent at least, these towns may be regarded as border points.

The Canadian carriers have joined with American carriers in the publication of joint rates for the carriage of asbestos to points in the middle-Atlantic states and the middle-west. However, for the carriage of asbestos to the southern-Atlantic states the carriers concerned have not published joint rates but instead have published combination rates.[3] One factor of these combination rates is a proportional rate[4] pertaining to the transportation from the mines in Quebec to the Vermont points of interchange. The other factor is a local rate pertaining to the transportation from these points of interchange to the various southern destinations.

In 1951 Thermoid Company, Southern Division, a manufacturer of asbestos textile products, located in Charlotte, North Carolina, filed with the Commission a complaint alleging that the combination rates for the carriage of asbestos from mines located along the lines of the Quebec Central to Charlotte were unreasonable and were prejudicial in comparison with the joint rates given complainant's competitors in the middle-Atlantic states and the middle-west. As the complaint wound its way upward through the various levels of Commission adjudication, four additional complaints of a similar nature were consolidated with it.[5] In its decision the Commission accepted complainants' contentions. It held that the Quebec-Carolina rates were unreasonable and prejudicial and ordered reparation to the extent that the rates exceeded the rates for comparable distances charged complainants' competitors in the middle-Atlantic states and the middle-west.

 We are, of course, without authority to consider the validity of the Commission's orders allowing repara-

---

3. In railroad parlance a *joint* rate on a through route differs from a *combination* rate on a through route in that a joint rate is reached through an agreement of the participating carriers and each participating carrier is jointly and severally liable for the entire rate. See Louisville and N. R. Co. v. Sloss-Sheffield Co., 1925, 269 U.S. 217 at pages 231–234, 46 S.Ct. 73, 70 L.Ed. 242.

4. A *proportional* rate covers a portion of a through route and differs from a *local* rate between the same points in that the proportional rate applies only to transportation on the through route. See Lewis-Simas-Jones Co. v. Southern Pacific R. Co., 1931, 283 U.S. 654, 663, 51 S.Ct. 592, 75 L.Ed. 1333. Apparently the rates south of East Alburg and Newport to the Carolinas are merely local rates.

5. The net effect of the consolidation was to increase the number of complainants to four so that the group then included manufacturers of asbestos products in Charlotte, Davidson and Marshville, North Carolina, and North Charleston, South Carolina and to expand the complaint so as to bring into question the rates from the mines along the Canadian National as well as those from the mines along the Quebec Central.

The four complainants in the proceedings before the Commission have intervened in this action under 28 U.S.C. § 2323.

tions;[6] and plaintiffs here do not argue that the Commission's findings as to the unreasonableness and prejudicial character of the Quebec-Carolina rates were without substantial evidentiary basis if these rates are to be viewed as an indivisible entity. Plaintiffs' argument before this court is confined to the contention that the Commission exceeded its power in failing to limit its jurisdiction to the local rate factor from the points of border interchange in Vermont southward to the Carolinas.

The Commission's power with respect to transportation wholly by railroad is set forth in Sections 1(1) (a) and 1(2) of the Interstate Commerce Act, 49 U.S. C.A. §§ 1(1) (a), and 1(2). These sections in pertinent part read as follows:

(1) "Carriers subject to regulation

"The provisions of this chapter shall apply to common carriers engaged in—

"(a) The transportation of passengers or property wholly by railroad, * * *

* * * * * *

"* * * from or to any place in the United States to or from a foreign country, *but only insofar as such transportation* or transmission *takes place within the United States.*"

(2) "Transportation subject to regulation

"The provisions of this chapter shall also apply to such transportation of passengers and property * * * *but only in so far as such*

*transportation* or transmission *takes place within the United States* * * *.*" (Italics supplied).

■■ As the Commission emphasized in its decision in the present case, it is now firmly established that American rail carriers have a clear alternative with respect to the manner of publishing rates applicable to international transportation. They may choose to publish rates applicable only to that portion of the transportation which they themselves perform; or they may join with the foreign carrier and publish a joint rate for the entire transportation, thereby assuming joint and several liability for any unlawfulness in the rate agreed upon. Thus it is well settled that the Commission does not have power to require carriers to enter into joint rates for international transportation. See Lewis-Simas-Jones Co. v. Southern Pac. R. Co., 1931, 283 U.S. 654, 660, 51 S.Ct. 592, 75 L.Ed. 1333; ·Fruit Importers v. Atlantic Coast Line R. Co., 188 ICC 520, 523 (1932); International Nickel Co. v. Director General, 66 ICC 627 (1922). However, it is equally well settled that the Commission does have power to pass upon the legality of existing joint rates on international transportation, and, in connection with this power, in a proper case, it may order the American carriers to cease participation in these rates, and to pay reparations. This was the Commission's interpretation prior to the 1920 amendments to Sections 1(1) and 1(2), which for the first time expressly limited the Commission's jurisdiction to transportation "only insofar as such transportation * * * takes place within the United States."[7]

---

6. Under 28 U.S.C. § 2321 the jurisdiction of a three-judge district court extends to all orders of the Commission save those " * * * for the payment of money or the collection of fines, penalties and forfeitures * * *." Under 49 U.S.C.A. § 16(2) an action for the enforcement of a reparations order is to be brought by the complainant in one of several district courts or in a state court. In United States v. I.C.C., 1949, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 the Supreme Court indicated that the activities of a three-judge district

court were to be carefully confined to those expressly provided for by Congress.

7. Prior to Februry 28, 1920 Section 1(1) declared the Act to be applicable to carriers engaged in any of four types of international transportation: (1) from the United States to an adjacent foreign country; (2) from the United States through a foreign country to the United States; (3) from the United States to a foreign country when shipment is being carried from an originating point in the United States to a port of transshipment;

See Black Horse Tobacco Co. v. Illinois Central R. Co., 17 ICC 588, 590 (1910). The Commission quickly held that the 1920 amendments did not affect this power that had been exercised over existing joint international rates, International Nickel Co. v. Director General, 66 ICC 627 (1922). The Supreme Court has upheld the Commission's interpretation in two cases, News Syndicate Co. v. New York Cent. R. Co., 1927, 275 U.S. 179, 48 S.Ct. 39, 72 L.Ed. 225 and Lewis-Simas-Jones Co. v. Southern Pac. R. Co., 1931, 283 U.S. 654, 51 S.Ct. 592, 75 L.Ed. 1333.[8]

The rates the Commission found unreasonable and prejudicial in the present case, however, were not joint rates, but were combination rates. The Canadian carriers published proportional rates to East Alburg, Vermont, and Newport, Vermont, the interchange points; and the American carriers published local rates for the remainder of the transportation. The Commission does not dispute plaintiffs' statement that there are no facilities for interchange available between the international boundary and East Alburg and Newport. Nor does the Commission dispute that, as to shipments under the assailed combination rates, the Canadian carriers operate within the United States only for the purpose of turning over the asbestos to American carriers.[9] In its decision the Commission made no findings that the local rates south of the interchange points were unreasonable or prejudicial. The Commission, nevertheless, held that it had power to review the entire transportation charge—from mines in Quebec to consignees in the Carolinas—because the interchange occurred within the United States.[10] The Commission stated its position in the following words:

"The contentions of the defendants are based on the assumption that since Newport and East Alburgh are ports of entry, they are, for all practicable purposes, border points, and that the rates thereform to the considered destinations con-

(4) from a foreign country to the United States when the shipment is being carried to a terminating point in the United States from a port of entry either in the United States or in an adjacent foreign country. In Galveston, H. & S. A. R. Co. v. Woodbury, 1920, 254 U.S. 357, 41 S.Ct. 114, 65 L.Ed. 301, a case decided under Section 1(1) as it existed prior to the 1920 Amendments, the Supreme Court held that transportation *from* an adjacent foreign country to the United States was within the Commission's jurisdiction under the provisions relating to the transportation from the United States to an adjacent foreign country. On Feburary 28, 1920 (Section 400 of the Transportation Act of 1920, 41 Stat. 474) Section 1(1) was amended to apply to transportation: (1) from the United States through a foreign country to the United States, and (2) from or to the United States to or from a foreign country; but only insofar as these two types of international transportation take place within the United States. Section 1(2) quoted in the opinion, was a new section added by the 1920 Act.

8. There is language in News Syndicate, supra, 275 U.S. at pages 186–187, 48 S.Ct. at page 40, and Lewis-Simas-Jones, supra, 283 U.S. at page 663, 51 S.Ct. at page 596, which might be construed as indicating that the Commission would be without jurisdiction over the joint rate if the American carrier had also published a rate for the American portion of the transportation. The Commission, however, has subsequently held that it has jurisdiction over joint rates irrespective of whatever additional rates may be filed. Carstens Packing Co. v. Great Northern R. Co., 264 ICC 164 (1945); see also Cyanamid and Cyanide from Niagara Falls, Ont., 155 ICC 488 (1929); Publication of Rates between United States and Canada, 147 ICC 778 (1928).

9. Because the Canadian rate is a proportional rate, it does not apply to any shipments to American consignees at points between the international boundary line and the interchange points, nor does it apply to shipments to be delivered by Canadian carriers to consignees located at the interchange points.

10. As to those shipments where the interchange occurred at St. Johns, Quebec, the Commission held that the Canadian carrier was not liable for reparation. Apparently, however, the American carriers were liable for reparation even as to these shipments.

form to the first alternative mentioned above. [The Commission's reference is to publication of rates to and from the international boundary] The facts indicate otherwise. Newport and East Alburgh are about 5 and 3 miles, respectively, south of the international boundary, and the proportional rates maintained by the Canadian lines to these points obligate those carriers to provide substantial transportation service within the United States. The act makes no distinction between domestic and foreign carriers in this repect. It applies to all common carriers by railroad to the extent that such transportation takes place within the United States."

First, it should be observed that although the Commission stated that it was regulating transportation which took place within the United States, it made no effort, when it handed down its finding as to the unreasonableness of the assailed transportation charge, to distinguish between that portion of the charge covering the transportation which took place in the United States and that portion covering the transportation within Canada.[11] It is now settled that the Commission need not make this distinction if the international transportation is conducted on the basis of a joint rate because the American carriers have elected to become jointly and severally liable for the entire transportation charge, and because a contrary rule would force the Commission to rely upon the unpublished and possibly unverifiable divisions of the joint rate between the American carrier and the foreign carrier. This is not the situation where the American carrier and the foreign carrier each publish rates to and from a border point where interchange occurs. In this latter situation, unless the rate of the foreign carrier is left to regulation by the foreign country the phrase "but only insofar as such transportation takes place within the United States" will be drained of all meaning. Surely the fact that interchange occurs a few miles on one side of the boundary as opposed to a few miles on the other side, is a fortuitous event, an event upon which Congress could hardly have intended the Commission's jurisdiction to hinge. It is our belief that the Commission would give short shrift to an argument that it had no jurisdiction over the American factor if the interchange occurred at a border point a few miles within the foreign country.[12]

Second, if the Commission's action in the present case were approved by us it would follow that in situations where the foreign factor is the unreasonable factor American carriers will be held liable for a portion of overcharges that they had no part in formulating.

Third, the Commission would appear to have been in error when, in its decision in the instant case, it stated that its prior holdings support its present position. The Commission relied upon Fruit Importers v. Atlantic Coast Line R. Co., 203 ICC 139 (1934); Newsprint Paper to Detroit, 161 ICC 63 (1930); Simpson Co. v. Grand Trunk W. R. Co., 129 ICC 430 (1927); Larrowe Milling Co. v. Chatham W. & L. E. R. Co., 52 ICC 145 (1919); Iron and Steel Wire, Buffalo, N. Y. to Kitchener, Ont., 294 ICC 515 (1955); and to a lesser extent upon Control of Hereford Ry. Co., 99 ICC 7 (1925) and Status of Napierville Junction R. Co., 266 ICC 471 (1946). In Fruit Importers, Newsprint to Detroit, Simpson Co., and Wire, Buffalo to Kitchener, the assailed rates were joint rates over which the Commission's jurisdiction is conceded. In Larrowe Milling the

11. In its decision in the present case the Commission states, at p. 754, that its jurisdiction here exists "regardless of the manner of rate publication." We gather this to mean that the Commission would not have reached a different result if the Canadian carriers had published a proportional rate from the points of origin to the border and an additional, and meaningless, proportional rate from the border to the border points of interchange.

12. See note 10, supra.

shipper assailed carload minima concurred in by both the Canadian and American carriers, thus presenting a situation analogous to a joint rate. In Control of Hereford Ry. Co., a case involving the application of an American carrier to acquire control of a line 52.85 miles in length of which all but 0.67 miles were in Canada, and to abandon operations along this line, the Commission held it had authority to approve the acquisition under Section 5(a) but that its abandonment jurisdiction extended only to the trackage within the United States. In Napierville Junction the Commission held that a Canadian line whose trackage ended at the international boundary was not subject to the provisions of the Act even though its crews and equipment did conduct some operations on the one mile of track in the United States between the border and Rouses Point, N. Y. These last two cases hardly support the expanded interpretation of its jurisdiction which the Commission has advanced in the present case.

■ Not only do the cited decisions fail to support the Commission's present position, but, furthermore, whenever the problem has previously been faced the Commission has indicated that it lacked jurisdiction to review the foreign factor of a combination international rate.[13] In Albee Fruit Co. v. Atlantic Coast Line R. Co., 293 ICC 785, Montreal consignees of fresh fruit from the Florida area filed complaints as to the combination rates made over Rouses Point, N. Y. In limiting its jurisdiction the Commission stat-

ed: "The rates here assailed are combination rates based on border points, and the only factors in such combinations over which we have jurisdiction are those applying to such border points." Hoffman-Taff, Inc. v. St. Louis S. F. R. Co., 279 ICC 710, 712 (1950) involved rates on shipments of aqua ammoniae from originating points in Canada to Springfield, Missouri. The rates were combination rates made over Detroit and Port Huron, Michigan, and apparently the complaint attacked only the Canadian portion of the rates. The Commission stated: "On the instant traffic, the United States carriers concerned elected not to join in the publication of single-factor through rates, and the combinations on Detroit and Port Huron, which for all practical purposes are international border points, applied. Only the Canadian rates, as factors of the through combinations are assailed. The defendants operating within this country are not answerable for those rates, but only for the rate from the border points to destination and which is not here assailed. It follows that the complaint assails rates over which this Commission has no jurisdiction." In E. J. Stanton v. Atchison, T. & S. F. R. Co., 258 ICC 315 (1944) the Commission, after holding the American factors to be reasonable, refused to pass upon the Canadian factors of combination rates on the shipment of lumber from Los Angeles to the Maritime Provinces made over Port Huron, Detroit, Buffalo, and Rouses Point. For cases of similar import see Dow Chemical Co. v.

13. Watab Paper Co. v. Canadian National R. Co., 152 ICC 265 (1929) appears to be the single exception to the above statement. Watab involved shipments of pulpwood from Manitoba points of origin approximately thirty miles north of the border to a consignee in central Minnesota. After reaching the interchange point of Warroad, Minnesota, approximately six miles south of the border, the shipments were misrouted so as not to travel along the least expensive routing. In computing damages the Commission held that the factor from the Manitoba points of origin to Warroad was unreasonable. Jurisdiction to make such a holding was premised upon a Section 4 violation, resulting from the fact that the rates from the Manitoba points of origin to Warroad were greater than the rate from the points of origin to International Falls, Minnesota, a point approximately seventy-five miles east of Warroad and a point which shipments from the points of origin could reach only by routing through Warroad. However, the Commission, recognized that these circumstances were most unusual, stating at p. 268: "Where the rate from a point in Canada to a destination in the United States *is based on a combination of the rates to and from a border point within the United States, our jurisdiction ordinarily extends only to the rate within the United States.*" (Italics supplied).

Alton & S. R. Co., 284 ICC 365 (1952); Crelinsten v. Railway Express, 201 ICC 284 (1934); Fruit Importers v. Atlantic Coast Line R. Co., 188 ICC 520 (1932). In summary, then, the Commission has consistently interpreted its statute in a manner contrary to its interpretation in the present case. This consistent interpretation ought not to be set aside, either by the courts or by the Commission, without a strong showing to justify departure. United States v. Leslie Salt Co., 1956, 350 U.S. 383, 395–397, 76 S.Ct. 416, 100 L.Ed. 441; F.T.C. v. Bunte Bros., 1941, 312 U.S. 349, 351–352, 61 S.Ct. 580, 85 L.Ed. 881.

It is contended that support for the Commission's present interpretation may be found in Great Northern R. Co. v. Sullivan, 1935, 294 U.S. 458, 55 S.Ct. 472, 79 L.Ed. 992. The Sullivan case involved the complaint of a North Dakota consignee of lignite mined in Alberta, Canada. The shipments moved on a combination rate made over an international-border point located within the United States. The Commission awarded reparations upon a finding that the American factor was unreasonable. The Supreme Court reversed, holding that an award of reparations was improper without a finding that the entire rate, i. e., the sum of the American and Canadian factors, was excessive. Thus it is argued that Sullivan equated combination international rates with joint international rates for purposes of the Commission's jurisdiction. We believe that a closer reading of the Sullivan case will reveal that the Court there was not dealing with the Commission's jurisdiction, but rather with the consignee's proof of injury. As we read the case the Court held that a complainant seeking reparations by attacking the American factor of a combination international rate must not only demonstrate the unreasonableness of the factor over which the Commission has jurisdiction but also the unreasonableness of the sum of the combined rates.

Finally, the Commission argues that unless we accept its present interpretation there will be left an unregulated "no-man's land" between the international boundary and the interchange points. This argument is unpersuasive. The issue here is whether the Commission has jurisdiction over certain rates, not whether the Commission has jurisdiction over the Canadian carriers. If, for example, the Canadian carriers sought to abandon service between the interchange points and the border, or if they sought to lease their trackage in the United States to another carrier, the Commission clearly would have jurisdiction. See Control of Hereford Ry. Co., 99 ICC 7 (1925); Lease of Line by Canadian Pac. R. Co., 105 ICC 575 (1926). We merely hold that the carriage of freight by rail on a proportional rate from a point of origin in Canada over the international boundary to a border point within the United States for the purpose of interchange is not such transportation within the United States as will give the Commission jurisdiction over the foreign factor of the combination rate.

The orders described in note 2, supra, are annulled and set aside, and the cause is remanded for further proceedings in conformity with this opinion.

FOLEY, GIBSON, District Judges, concur.