## CHAPMAN, Secretary of the Interior v. EL PASO NATURAL GAS CO. et al.

### No. 11078.

United States Court of Appeals District of Columbia Circuit.

Argued May 13, 1952.

Decided March 26, 1953.

See also 89 App.D.C. 267, 192 F.2d 404.

Harold S. Harrison, Atty., Department of Justice, Washington, D. C., with whom Roger P. Marquis, Atty., Department of Justice, Washington, D. C., was on the brief, for appellant. Deputy Atty. Gen. A. Devitt Vanech also entered an appearance for appellant.

Howard Boyd, Washington, D. C., and Allen R. Grambling, El Paso, Tex., pro hac vice, by special leave of Court, with whom Paul R. Connolly and Joseph M. F. Ryan, Jr., Washington, D. C., were on the brief, for appellee El Paso Natural Gas Company. Joseph J. Smith, Jr., Washington, D. C., also entered an appearance for appellee El Paso Natural Gas Company.

Roger J. Whiteford and Hubert A. Schneider, Washington, D. C., entered appearances for appellees Southern Union Gas Company, City of Flagstaff, Arizona, Town of Williams, Arizona, and City of Winslow, Arizona.

Before CLARK, PRETTYMAN and PROCTOR, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Columbia.

Appellee is a corporation engaged in the transportation and sale of natural gas in interstate commerce. For convenience, we shall refer to it as "El Paso", and the Secretary of the Interior will be referred to as "the Secretary". El Paso undertook to construct a gas pipe line from New Mexico to California, and to that end obtained appropriate authorization from the Federal

Power Commission. There were prolonged negotiations between El Paso and the Secretary looking to the grant of rights-of-way for the proposed line across public lands. The Secretary is authorized to grant such rights-of-way by Section 28 of the Mineral Leasing Act of February 25, 1920, as amended. 49 Stat. 678 (1920), 30 U.S. C.A. § 185. On July 21, 1950, the Secretary through his qualified agent, issued a "Decision" setting forth his requirements for the granting of rights-of-way to El Paso. By letter of August 18, 1950, he informed El Paso that filing a form of stipulation,[1] would be "satisfactory as compliance with the common carrier stipulation requirement in connection with the applications which the El Paso Natural Gas Company proposes to file for the San Juan Basin Pipe Line * * *." El Paso executed the stipulation and filed the same with the Secretary.

From time to time, as construction of the San Juan Basin pipe line progressed, El Paso applied for and promptly received certain rights-of-way. In the continuing relations between El Paso and the Secretary, concerning rights-of-way for other lines as well as for San Juan, there developed a disagreement as to the specific nature of El Paso's obligation as a common carrier in the operation of its gas lines. When all but a very small portion of the San Juan Basin line had been built,[2] on March 22, 1951, by letter, the Secretary, through his authorized representative, informed El Paso that the remaining rights-of-way needed for completion of the line would not be granted unless El Paso signed a stipulation[3] which accompanied the letter

1. The stipulation reads in full: "The applicant agrees to operate the pipe line as a common carrier in accordance with the provisions of the Mineral Leasing Act, and, within 30 days after the request of the Secretary of the Interior, to file rate schedule and tariff for the transportation of gas as such common carrier with any regulatory agency having jurisdiction over such transportation, as the Secretary may prescribe."

2. At an expenditure of some $40,000,000.

3. (a) The applicant agrees that it will operate the pipe line as a common carrier in accordance with the provisions of the Mineral Leasing Act and pertinent regulations heretofore or hereafter adopted thereunder and that, in accordance with this obligation, it will transport natural gas for others, whether such gas is produced from government lands or not, at reasonable rates and subject only to such conditions as may be determined by the Secretary of the Interior pursuant to paragraph (b) of this stipulation, not to be inconsistent with this obligation. The applicant agrees to provide common carrier transportation service requested, including firm service, under rates schedules or tariffs filed in accordance with paragraph (b) of the stipulation, wherein the rates and charges for common carrier transportation shall not exceed, at the time of initial filing of the schedules or tariffs with the regulatory agency having jurisdiction over such transportation, the component transportation cost element or charge in rates and charges for the sale of natural gas by applicant under filed tariffs involving transportation for substantially comparable service and distances via the same pipe line. When any request for the transportation of natural gas is made, the applicant agrees promptly, or within such time as may be fixed by the Secretary, to file with any regulatory agency having jurisdiction over such matter an application for issuance of authority to the applicant (1) to transport such gas, if an application for such authority is required by the law applicable to such agency or by the rules or regulations of such agency, and, if necessary, (2) to increase the capacity of its pipe line sufficiently to enable the applicant to provide for the transportation of the natural gas proposed for shipment, provided that the prospective shipper shall join in any request for increasing the capacity of the pipe line and provided that the prospective shipper shall advise the applicant in writing that at any hearing upon such application it shall have the burden of showing an adequate gas supply, markets, and other relevant facts necessary to establish, consistent with applicable law, the economic feasibility of the facilities and investment required to provide necessary added capacity and to justify the issuance of authority for the construction of such facilities. If the increased capacity is authorized, the applicant agrees to proceed diligently to provide the increased capacity for the common carrier transportation as authorized.

(b) The applicant further agrees, within 30 days from the date of a request by the Secretary of the Interior, to submit

and accepted the conditions of that stipulation.

El Paso filed suit for a mandatory injunction to require the Secretary to issue the remaining rights-of-way, and to enjoin the Secretary from attaching conditions to such rights-of-way beyond the authority of the Secretary to exact. Negotiations continued between the parties, with the result that a still further form of proposed stipulation was submitted to El Paso under date of May 29, 1951.[4] This, too, was rejected by El Paso.

to the Secretary a rate schedule or tariff for the transportation of natural gas as a common carrier and, within 15 days from the date when the applicant is notified by the Secretary that such schedule or tariff is not inconsistent with the applicant's obligation to transport gas as a common carrier, to file such rate schedule or tariff with any regulatory agency having jurisdiction over such transportation, as the Secretary may prescribe. If the Secretary determines that the rate schedule of tariff or any part thereof is inconsistent with the applicant's obligation to transport gas as a common carrier, the applicant shall, within 15 days after receipt of notice of such determination, submit to the Secretary a revised schedule or tariff which shall be consistent with its obligation to transport gas as a common carrier. Such rate schedule or tariff shall include the agreement of the applicant set forth in paragraph (a) of this stipulation, to transport natural gas as a common carrier or to provide such additional capacity in its pipe line as may be needed for the transportation of natural gas whenever its capacity for common carrier transportation is inadequate. Any amendment to, or revision of, a rate schedule or tariff shall be handled in accordance with the procedure prescribed in this paragraph.

(c) None of the specific provisions of this stipulation shall be construed to limit in any way the obligation of the applicant to operate its pipe line as a common carrier in accordance with the provisions of the Mineral Leasing Act and pertinent regulations heretofore or hereafter adopted under that act or any other obligation imposed on the applicant by such act or regulations, and any violation of such obligation, including the specific obligations contained in this stipulation, shall be ground for the cancellation of the grant of the right-of-way, as provided in the Mineral Leasing Act.

4. (a) The applicant agrees that it will operate the pipe line as a common carrier in accordance with the provisions of the Mineral Leasing Act as now or hereafter amended and pertinent regulations heretofore or hereafter adopted thereunder and that it will transport natural gas for

204 F.2d—4

others, whether such gas is produced from government lands or not, at reasonable rates and subject to conditions to be allowed or determined by the regulatory agency having jurisdiction over such transportation, provided that no condition shall be imposed by the applicant which is inconsistent with the applicant's obligation to operate its pipe line as a common carrier. The applicant agrees to provide common carrier transportation service requested, including firm service, as follows:

(1) When any request for the transportation of natural gas is made and there is unused capacity in the applicant's pipe line, the applicant agrees promptly, or within such time as may be fixed by the Secretary, (i) to file with the regulatory agency having jurisdiction over such matter an application for issuance of authority to the applicant to transport such gas, to the extent of the unused capacity of the pipe line, if an application for such authority is required by the law applicable to such agency or by the rules or regulations of such agency, and, upon the issuance of such authority, to commence to render service to the extent of the unused capacity of the pipe line pursuant to the terms and conditions of such authority, or (ii) where no such authority need be obtained in advance of transportation, to file a rate schedule or tariff with such regulatory agency and to commence to render transportation service at the rates and subject to the conditions allowed or determined by such agency. Nothing in this paragraph (1) shall be construed to prevent any right of appeal which the applicant may have under applicable law from the issuance of authority under clause (i) or from any determination of rates or conditions under clause (ii) of the preceding sentence, but no appeal taken by the applicant shall delay the commencement of transportation service by the applicant as provided in that sentence.

(2) If there is no unused capacity or insufficient unused capacity in the applicant's pipe line at the time when the request for transportation is made, the applicant agrees promptly, or within such time as may be fixed by the Secretary, to file with any regulatory agency having

The District Court ordered the rights-of-way issued, and enjoined the Secretary from requiring El Paso to file any form of stipulation other than that contained in the Secretary's letter of August 18, 1950, supra. In its conclusions of law, the court ruled that the Secretary fully exercised and exhausted his discretion when he decided and concluded that the common carrier obligation of the Mineral Leasing Act, supra, would be fulfilled by El Paso's execution and filing of the stipulation contained in the Secretary's letter of August 18, 1950, and also that the terms of the proposed stipulations of March 22, 1951, and May 29, 1951, were beyond the Secretary's authority, arbitrary, capricious, and an abuse of discretion.

jurisdiction over such matter an application for issuance of authority to the applicant to increase the capacity of its pipe line sufficiently to enable the applicant to provide for the transportation of the natural gas proposed for shipment, but the applicant shall not be required to apply for the issuance of authority to increase the capacity of its pipe line to such an extent that such increased capacity, when added to any increased capacity theretofore provided pursuant to this stipulation, will exceed that capacity of the pipe line not devoted to common carrier transportation at the time the request for common carrier transportation is made. The applicant shall be required to file an application for authority to increase the capacity of its pipe line only if the prospective shipper joins in such application and only if the prospective shipper advises the applicant in writing that at any hearing upon such application the shipper shall have the burden of showing an adequate gas supply, markets, and other relevant facts necessary to establish, consistent with applicable law, the economic feasibility of the facilities and investment required to provide necessary added capacity and to justify the issuance of authority for the construction of such facilities, and that the shipper agrees to offer natural gas for transportation through the applicant's pipe line, upon completion of the construction of the increased capacity within a reasonable time, in such amounts and for such period of time as will be sufficient to pay the construction and operation costs allocable to his shipments plus a reasonable return on the investment allocable to such shipments. Applicant further agrees to proceed diligently to provide the increased capacity for common carrier transportation, the construction of which is authorized by any final order of any regulatory agency having jurisdiction over such transportation, provided that the applicant will not be required to construct such additional facilities until it is able to obtain necessary outside funds, if any are needed, on terms submitted to and sanctioned by the regulatory agency in connection with the application to obtain such authority, but nothing herein contained shall be construed as a waiver of any right which the applicant may have under applicable law to appeal from such final order.

Upon completion of construction under such authorization, applicant will take all steps necessary, including the filing of rate schedules or tariffs where required, to commence service pursuant to the terms and conditions of the authorization and at the rates and subject to the conditions allowed or determined by the agency. Nothing in the preceding sentence shall be construed to prevent any right of appeal which the applicant may have under applicable law from any determination of rates or conditions by the regulatory agency, but no such appeal taken by the applicant after the completion of construction, shall delay the commencement of transportation service by the applicant as provided in that sentence.

(b) Any rate schedule or tariff filed under paragraph (a) shall include the provisions set forth in paragraph (a) of this stipulation and no change shall be made in paragraph (a) without first obtaining the approval of the Secretary of the Interior. A copy of such rate schedule or tariff and of any amendment to, or revision of, a rate schedule or tariff shall be furnished to the Secretary of the Interior when the original is filed with the regulatory agency.

(c) None of the specific provisions of this stipulation shall be construed to limit in any way the obligation of the applicant to operate its pipe line as a common carrier in accordance with the provisions of the Mineral Leasing Act as now or hereafter amended and pertinent regulations heretofore or hereafter adopted under that Act or any other obligations imposed on the applicant by such Act or regulations, and any violation of such obligation shall be ground for the cancellation of the right-of-way as provided in the Mineral Leasing Act.

■ The Secretary asserts that his authority to attach the conditions of the stipulations of March 22, 1951, and May 29, 1951, will be found in Section 28 of the Mineral Leasing Act, supra, which imposes the requirement that rights-of-way issued by the Secretary contain the express condition that the pipe lines be "constructed, operated, and maintained as common carriers", together with Section 32 thereof, which authorizes the Secretary to establish rules and regulations to accomplish the purposes of the Act. Directing our attention first to Section 32, we do not consider that section to authorize conditions such as those set forth in the stipulations.

■■ As for Section 28, in the absence of more specific language by Congress, we regard the condition that pipe lines be constructed, operated, and maintained as "common carriers" to embrace the common law meaning of the term. Compare McNally v. Hill, 1934, 293 U.S. 131, 136, 55 S.Ct. 24, 26, 79 L.Ed. 238, and see 3 Sutherland, Statutory Construction, §§ 5303, 5304 (3rd ed. 1943). Ample protection of the public interest exists, and adequate enforcement of the condition is possible, under the provision for forfeiture of the grant by the United States District Court, in an appropriate proceeding, for failure to comply with the provisions of the section or with appropriate regulations and conditions established by the Secretary. The language of Section 28 clearly gives the Secretary authority to provide regulations and conditions as to survey, location, application, and use, but we read that to pertain to the physical aspects of the rights-of-way and not to the operation of the pipe line. Without more than the requirement that a condition be imposed that pipe lines be "constructed, operated, and maintained as common carriers", we do not regard the statute as conferring upon the Secretary authority to exercise so vast and so detailed a power as the promulgation of specific regulations and conditions for operation of the pipe line as a common carrier, as attempted in the proposed stipulations of March 22 and May 29, 1951.

As further support to that view, the statute does not purport to express adequate standards for guidance of the Secretary in the complex problems attendant upon such intimate regulation of corporate affairs as the financing, construction, and employment of facilities as is attempted in the contested stipulation. Had Congress desired the Secretary to enter upon such comprehensive supervision of those to whom rights-of-way were granted, we believe it would have expressed its desire more clearly and in more detail. Instead, Congress required that a condition be incorporated in any rights-of-way granted, and provided for court decision of any question which might arise as to the adequacy of compliance. It is significant, also, that for thirty-one years the Secretary of the Interior has made no such extensive effort at regulation, thus leaving at least a question that he did not consider the authority to exist. See F.P.C. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 513, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499; F.T.C. v. Bunte Brothers, 1941, 312 U.S. 349, 352, 61 S.Ct. 580, 582, 85 L.Ed. 881; Norwegian Nitrogen v. U. S., 1933, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796.

Indeed, when Congress later, by passage of the Natural Gas Act, 15 U.S.C.A. § 717 et seq., recognized the need for regulation of gas pipe lines operating in interstate commerce, not only were careful and detailed standards set forth, but specific provision was also made that the regulatory body—the Federal Power Commission—should have no authority to compel enlargement of facilities, or extension or improvement of services, if to do so would impose an undue burden upon the pipe line company or impair its ability to render adequate service to its customers. Before the Commission may enter an order for extension or enlargement of facilities or service, it must first grant opportunity for hearing, and it must thereafter find that no undue burden would be imposed by the contemplated order. No such reasonable limitations appear in the contested stipulations.

Even more, without regard to the provisions of the March 22 and May 29, 1951, stipulations, the requirements which they seek to impose, and the provisions they set forth concerning the obligations falling up-

on the pipe line as a common carrier and upon one seeking carriage of gas, are those of contract carriage and not of common carriage as we understand the term. By the terms of the stipulation, if gas is proferred for common carriage, appellee would be required to increase the capacity of its line to accommodate that gas, subject only to the limitation that the increase in capacity cannot be required to be in excess of that part of the existing capacity devoted to private carriage. But the terms of the stipulations defeat the asserted purpose because they provide for contractual arrangements between shipper and pipe line, in advance of construction, which immediately remove any new capacity from availability for common carriage.

We do not agree with El Paso's proposition that the Natural Gas Act impliedly repealed the requirement of Section 28 of the Mineral Leasing Act that rights-of-way be subject to the express condition that pipe lines be "constructed, operated, and maintained as common carriers". When Congress enacted the Natural Gas Act it did so in recognition of the fact that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest". 52 Stat. 821 (1938), 15 U.S.C.A. § 717. It studied the problem with great care, and incorporated in the Natural Gas Act the objectives to be accomplished and the methods and standards by which they were to be pursued. The provisions of the two statutes are fully compatible. By the language of Section 28 of the Mineral Leasing Act, it is mandatory that the Secretary of the Interior attach express condition to any right-of-way granted requiring that the pipe line be maintained as a common carrier. Thereafter, activities of the company are subject to the plenary jurisdiction of Federal Power Commission under the provisions of the Natural Gas Act. By that Act, Congress expressed itself fully concerning the extent to which pipe line companies are to be regulated within the scope of Federal authority, and jurisdiction for such regulation was placed in the Federal Power Commission. But in the absence of unequivocal language placing jurisdiction for regulation in both the Commission and the Secretary of the Interior, we are not persuaded that the Secretary of the Interior is authorized to impose the conditions which he has sought to attach to the issuance of rights-of-way concerned in this litigation. We therefore hold that the so-called stipulations of March 22, 1951, and May 29, 1951, are beyond the authority of the Secretary of the Interior.

That ruling, however, does not dispose of the entire problem. The Government contends that the Decision of July 21 and the letter of August 18 were not considered by the parties, and could not be regarded in law, as a definitive conclusion of the controversy between El Paso and the Secretary; that the latter had the power to reopen the proceedings at any time, revoke any ruling he may have made earlier, and take whatever new and inconsistent action he desired, including the imposition of conditions and stipulations *ad infinitum;* [5] and that the courts had no power to determine how this continuing discretion ought to be exercised. We have examined the cases cited by appellant in support of this contention and have found them to be inapplicable here, for one reason or another. [6]

5. Subject only to the qualification that the action so taken not be contrary to the provisions of any statute.

6. Chapman v. Sheridan-Wyoming Coal Co., 1950, 338 U.S. 621, 70 S.Ct. 392, 94 L.Ed. 393, was limited by the Supreme Court to a factual situation where the right granted was negative only, the correlative burden being on the land of others. The Court clearly implied that a different result would be reached on different facts. Wilbur v. United States, 1930, 281 U.S. 206, 50 S.Ct. 320, 74 L. Ed. 809, was predicated on a finding that the original ruling was wrong and that it was the subsequent modification which stated the law correctly—obviously, quite the opposite of the situation here. Walker-Hill v. United States, 7 Cir., 1947, 162 F.2d 259, dealt with a tax ruling reversing an earlier legal opinion; no grants or licenses were even remotely in-

Similarly, F.P.C. v. Idaho Power Co., 1952, 344 U.S. 17, 73 S.Ct. 85, decided by the Supreme Court since we heard the present case, is not in point, in spite of some apparent similarities. There, the Court held that the Judiciary was without power to modify conditions attached to a license, the function of a reviewing court being at an end when it laid bare an error of law. But we are not dealing here with an order which seeks to compel the granting of a license *in futuro* or the modification and alteration of conditions embodied in the license prior to its issuance, but with an order which would simply require the Secretary to execute the purely ministerial act of issuing rights-of-way, pursuant to what we regard as a license granted previously without condition.[7] As for Larson v. Domestic & Foreign Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628, it is so different on its facts that the Supreme Court opinion in that case cannot be regarded as controlling here.

In our opinion, the District Court was entirely correct when it held as a fundamental conclusion of law that the Secretary had fully exercised and exhausted his discretion when he decided and concluded that the common carrier obligation of the Mineral Leasing Act would be fulfilled by execution of the stipulation contained in the letter of August 18. That letter, when read in conjunction with the decision of July 21, amounted to more than a vague statement of opinion or a pious expression of the views of the Secretary or his subordinates as of that particular moment, subject at any time to change or modification. These documents had the effect of laying down the policy of the Department of the Interior with respect to El Paso's application and of establishing the principle that El Paso was entitled to the rights-of-way, provided only that the required stipulation was filed, and

El Paso was therefore fully justified in regarding the decision of the Secretary as a legally binding determination that the actual certificates would be issued in due course, and in acting in reliance thereon. Title 43 of the Code of Federal Regulations, Part 221, Subpart B, describes in great detail the procedure to be followed in connection with decisions of the Director of Land Management and Secretary of the Interior. Obviously, there would be no need to set forth and describe the various motions, hearings, and appeals which may be had on a decision of this type were it intended to have no legal effect.

The decision of July 21, after there had been compliance with the terms and stipulations specified therein, was equipollent to a grant or license vesting authority in El Paso to construct a pipe line over certain designated Government lands. While the statute reposes discretion as to the issuance of rights-of-way in the Secretary of the Interior, that discretion by its very nature is not a continuing one. By the granting of a license to El Paso the Secretary necessarily made not an ephemeral, reversible determination, but he so exhausted and terminated whatever discretion he possessed with relation to this particular controversy that it thereafter became proper for the courts not only to strike down illegal conditions attached then or later but also to compel the Secretary affirmatively, by mandatory injunction, to perform whatever ministerial duties remained to be executed by him in the discharge of the initial policy decision.

■■ It may well be appropriate for a licensing authority to reopen proceedings of this kind after final determination has been made in order to correct clerical errors or to modify rulings on the basis of newly discovered or supervening facts, but a decision may not be repudiated for the

---

volved. Payne v. Houghton, 1903, 22 App.D.C. 234, merely held that new facts (a new issue of a magazine) warranted the entry of new rulings (denial of certificate to use the mails). To the same effect is N. L. R. B. v. Baltimore Transit Co., 4 Cir., 1944, 140 F.2d 51. Shawmut Ass'n v. S.E.C., 1 Cir., 1945, 146 F.2d 791 and F.C.C. v. WOKO, 329 U.S. 223,

67 S.Ct. 213, 91 L.Ed. 204 (1946), are authority only for the principle that an agency of the Government may deal differently with different parties.

**7.** Since El Paso complied with the original conditions, the effect is the same as if the grant had been unconditional.

sole purpose of applying some quirk or change in administrative policy, particularly where, as here, considerable funds have been expended in justifiable reliance upon the earlier ruling. For even the power of executive or administrative agencies is not without limits. Executive officers will, of course, not be subjected to positive court orders unless their duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to an unequivocal command. But if the sole duty still left to be performed is ministerial, an official would be transgressing the limits of his power were he to refuse to perform that duty. A mandatory injunction is then in order.

Affirmed.

PRETTYMAN, Circuit Judge (concurring in part).

I agree that the Secretary had no power to impose the disputed so-called stipulations of March and May, 1951, upon the remaining permits necessary to complete the line. And I agree that the court has the power and the duty to enjoin that proposed illegal action. I further agree that for the Secretary to refuse to issue these permits if the court enjoins the illegal stipulation would be an outrageous act in view of his formal official announcements of July 21 and August 18, 1950, his issuance of some permits, and the expenditure of millions of dollars by the permittees in reliance upon those announced terms. In my judgment the law ought to be that the official word of a Government officer acting within the scope of his authority should be the maximum in reliability—binding and not changeable at his wish. And I understand from the briefs before us that the Secretary will issue the permits upon the terms the courts approve.

But the Supreme Court in Larson v. Domestic & Foreign Corp.[8] has described the extent of the power of the courts where property of the United States is involved. It is clear that if an executive official refuses to perform an act which Congress has directed him to perform and as to which he has been left by the Congress with no discretionary choice, or if he refuses to perform a purely ministerial act, the court can compel him to act. But I do not find the present case in that posture. Within limits Congress gave the Secretary power to determine the conditions upon which permits would issue. That power involved a measure of discretion, and so, as an initial matter, within the statutory limitations, it could not be controlled by the courts. Then the question is whether the Secretary was so bound by his announcements of July and August, 1950, the issuance of permits upon those terms, and the investments of the permittees in reliance upon those announcements that he had no discretion left and the actual issuance of the remaining permits was merely a ministerial act. We must view that question in the light of the Larson opinion.

In the Larson case there was a written contract. As I read the opinion, the Court held that, even if the act of the officer in violation of the contract was tortious, and even if an action on the contract for damages would lie against the United States, nevertheless, if the disposition of the property was within the scope of the authority conferred upon the official by Congress, the courts can neither enjoin nor direct the act. The courts cannot compel the United States to comply with its contractual obligations. They can compel an officer to comply with a statutory mandate; they can restrict him to his statutory authority; and they can award damages for breach of a contract or for a tort. But otherwise they have no jurisdiction over his acts in respect to property of the United States. In the Larson opinion the Court specifically said:

"We hold that if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law, if they would be regarded as the actions of a private principal under the normal rules of agency. A Government officer is not thereby necessarily immunized from liability, if his ac-

8. 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

tion is such that a liability would be imposed by the general law of torts. But the action itself cannot be enjoined or directed, since it is also the action of the sovereign." [9]

And the Court also said:

"Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." [10]

The issuance of a permit which contains no illegal condition is an act of the Secretary which does not conflict with the terms of his valid statutory authority. As such it is an act of the sovereign and cannot be directed by a court.

The court holds that the Secretary exhausted his discretion when he prescribed terms in August, 1950. But it seems to me that that rule would apply to his prescription of terms and not to the act of transfer itself. The latter act remained the act of the sovereign and so immune from judicial direction. I find nothing in the statute which makes the executory announcements of 1950 the equivalent of a license executed except for signature. Even if they amounted to a binding contract, or were such as would create an estoppel in ordinary matters, the actual issuance of the permits remained an act of the sovereign. No act of Congress, active representative of the sovereign, limited the Secretary to terms once announced, or reduced the discretion conferred upon him. Whatever exhaustion of discretion occurred was by his act, not an act of the Congress. The Secretary could not, as I understand it, translate the nature of his act. He might make a contract or commit a tort. But he could not by some act of his own strip the permits of their nature as a sovereign act. Congress could so act on behalf of the sover-

eign as to leave the Secretary nothing but a ministerial duty, but the Secretary himself could not do that.

I would hope that the Supreme Court will agree with my brethren that I am wrong in my reading of the Larson opinion. But unless it does so I am bound by what I understand it to have said. Upon that basis I would enjoin the proposed stipulation as beyond the authority of the Secretary to impose, but I would not by specific mandate direct the issuance of the permits.

---

9. Supra, 337 U.S. at page 695, 69 S.Ct. 1457.

10. Id., 337 U.S. at page 691 n. 11, 69 S.Ct. 1457.