Arthur S. KURLAN et al.,
Plaintiffs-Appellants,

v.

Howard H. CALLAWAY, Secretary of
the Army, et al., Defendants-
Appellees.

No. 475, Docket 74–2347.

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1974.

Decided Dec. 27, 1974.

Steven J. Hyman, New York City (Samuel B. Mayer, Kunstler, Kunstler, Hyman & Goldberg, New York City, on the brief), for plaintiffs-appellants.

Robert S. Hammer, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for defendants-appellees Wilson and Baker.

Louis G. Corsi, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, New York City, of counsel), for defendant-appellee Callaway.

Before SMITH, HAYS and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

The central question raised by this appeal is whether certain members of the New York Army National Guard ("the Guard" herein) are entitled, after five years of service in the Guard as part of our country's Ready Reserve, to be transferred to the Standby Reserve (an organization requiring less active participation in military activities than does the Guard) by reason of their having been members of Guard units that were called by the President of the United States to active duty in 1970 pursuant to 10 U.S.C. § 673 to assist the Postmaster General in maintaining postal service during a strike of postal employees. Because appellants were away from their units at the time of the call-up serving on active duty *for training,* they did not perform any postal duty. Transfer of appellants to the Standby Reserve was refused by the Army on the ground that they had failed to comply with 10 U.S.C. § 269(e)(2),[1] which provides that only

---

1. 10 U.S.C. § 269(e)(2) provides in pertinent part as follows:

"(e) Except in time of war or of national emergency declared by Congress, a Reserve who is not on active duty, or who is on active duty for training, shall, upon his request, be transferred to the Standby Reserve for the rest of his term of service, if—

\*   \*   \*   \*   \*   \*

"(2) he served on active duty (other than for training) in the armed forces for an aggregate of less than five years, but satisfactorily participated, as determined by the Secretary concerned, in an accredited training program in the Ready Reserve for a period which, when added to his period of active duty (*other than for training*), totals at least five years, or such shorter period as the Secretary concerned, with the approval of the Secretary of Defense in the case of a Secretary of a military department, may prescribe for satisfactory participation in an accredited training program designated by the Secretary concerned.

those who have served on active duty "other than for training" are eligible for such transfer, and 10 U.S.C. § 269(g), which requires consent for the transfer of the governor of the state concerned (in this case the Governor of New York).[2]

Appellants, in an action instituted in the Southern District of New York against the Secretary of the Army, the Governor of New York and the Commanding General of the Guard, based on 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343 and 1361, sought injunctive relief enforcing their alleged right of transfer, upon completion of five years' service, pursuant to 10 U.S.C. § 269(e)(2). Judge

Robert J. Ward, adhering to his earlier decision in a similar case, Mela v. Callaway, 378 F.Supp. 25 (S.D.N.Y.1974), held that appellants, although actually engaged in training activities at the time of the call-up, qualified for active duty status within the meaning of § 269(e)(2), entitling them to transfer to the Standby Reserve upon consent of the Governor of New York as required by § 269(g). However, he further concluded that although Governor Rockefeller, by Executive Order 39,[3] issued on June 10, 1970, had consented to such transfers, appellants were no longer eligible because on July 10, 1974, Governor Wilson, by Executive Order 8,[4] modified the earlier order

"This subsection does not apply to a member of the Ready Reserve while he is serving under an agreement to remain in the Ready Reserve for a stated period." (Emphasis added).

2. 10 U.S.C. § 269(g) provides:

"(g) A member of the Army National Guard of the United States or the Air National Guard of the United States may be transferred to the Standby Reserve only with the consent of the governor or other appropriate authority of the State or Territory, Puerto Rico, the Canal Zone, or the District of Columbia, whichever is concerned."

3. Executive Order 39 provides:

"I, Nelson A. Rockefeller, by virtue of authority vested in me as Governor by the Constitution and the laws of the State of New York including Section 3 of the Military Law and by the laws of the United States including Title 10 United States Code, Section 269(g), do hereby consent to the transfer to the Standby Reserve of those members of the New York Army National Guard and New York Air National Guard, otherwise qualified, who apply for such transfer, and who complete five years of satisfactory service from the date of their enlistment and who performed full time duty in the active military service of the United States pursuant to Proclamation 3972 (35 Federal Register 5001) dated March 23, 1970, and Executive Order 11519 (35 Federal Register 5003) dated March 23, 1970, issued by the President of the United States, and do hereby authorize and direct the Chief of Staff to the Governor to accept applications for such transfers and institute appropriate processes to effect transfer of qualified applicants as soon as possible." Executive Order 1 of Governor Wilson, issued on December 3, 1973, continued the effective-

ness of previous Executive Orders. It provides:

"Having determined it to be in the public interest that there be no doubt as to the continued validity and effectiveness of executive orders heretofore issued by the Governors of the State of New York and now in effect, I, Malcolm Wilson, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and Laws of the State of New York, do hereby direct by executive order that all executive orders and amendments thereto heretofore issued and promulgated and in effect as of this date shall remain in full force and effect until otherwise revoked or modified."

4. Executive Order 8 provides:

"I, Malcolm Wilson, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the laws of the State of New York, do hereby direct by Executive Order that Executive Order Number 39 dated June 10, 1970 consenting to the transfer of certain members of the New York Army National Guard and the New York Air National Guard to the Standby Reserve, as continued by Executive Order Number 1 dated December 18, 1973, be amended to read as follows:

By virtue of the authority vested in me by the Constitution and laws of the State of New York including section 3 of the Military Law and by the laws of the United States including Title 10, United States Code, Section 269(g), I, Malcolm Wilson, Governor of the State of New York do hereby consent to the transfer to the standby reserve of those members of the New York Army National Guard and the New York Air National Guard, otherwise qualified, who apply for such transfer, and who

to deny any further transfers of Guardsmen in appellants' position. Accordingly he granted appellees' motion for summary judgment dismissing the complaint. We hold that those appellants who were eligible and had applied for transfer before July 10, 1974, were entitled to transfer to the Standby Reserve. We affirm as to all others. The case is accordingly remanded for further proceedings not inconsistent with this opinion.

This action has its genesis in the postal workers' strike that occurred in New York City in the spring of 1970. On March 23 of that year the President of the United States declared a state of national emergency and directed the Secretary of Defense to call reserves of the armed forces to active duty to assist the Postmaster General in restoring and maintaining postal service. Executive Order 11519, 35 Fed.Reg. 5003 (1970). The call-up, which was designated "Operation Graphic Hand," included members and units of the New York Army and Air National Guard.

In order to fulfill their military obligation members of the Reserve or of the Guard are required to serve a total of six (6) years either on active duty, on active duty for training or in the Reserve component of the United States Armed Forces, 10 U.S.C. § 651. As a result of having performed active duty in Operation Graphic Hand, federal Reservists (members of the Naval, Marine Corps, Army and Air Force Reserves) automatically become eligible after five years' service for transfer to the Standby Reserve for the remainder of their term pursuant to 10 U.S.C. § 269(e)(2). National Guardsmen, however, who are also members of the Ready Reserve, 10

U.S.C. § 269(b), become eligible for such transfer as a result of their being called to active duty only if, in addition, the governor of their state consents to the transfer, 10 U.S.C. § 269(g).

The difference between duty in the Ready Reserve and the Standby Reserve is not insignificant. A person in the Ready Reserve is subject to call-up "[i]n time of national emergency declared by the President" without further act of Congress, 10 U.S.C. §§ 672 and 673. He or she is also liable to call-up for up to two years as an unsatisfactory participant in the Ready Reserve, 10 U.S.C. § 673a(a). Finally, and probably most significant, a Ready Reservist is required to attend 14 days annual field training and at least 48 scheduled drills or training periods each year, 10 U.S.C. § 270. In contrast, a Standby Reservist is subject to call-up only "[i]n time of war or of national emergency declared by Congress," and then only if "the Director of Selective Service determines that the member is available for active duty," 10 U.S.C. § 672(a), and if there are insufficient numbers of Ready Reserve units or personnel available to meet the nation's needs, 10 U.S.C. § 674. Furthermore, the Standby Reservist is not required to attend drills or field training sessions.

Appellants contend that since they were members of units ordered to active duty in Operation Graphic Hand, they must, even though they did not serve with their units after call-up, be deemed to have been on active duty during that Operation for purposes of § 269. They further argue that permission for their transfer was granted by Executive Order 39 and that it could not validly be revoked by Executive Order 8 issued on

---

complete five years of satisfactory service from the date of their enlistment and who *actually* performed full time duty *with their assigned units* in the active military service of the United States pursuant to Proclamation 3972 (35 Federal Register 5001), dated March 23, 1970, and Executive Order 11519 (35 Federal Register 5003) dated March 23, 1970, issued by the President of the United States, and do hereby authorize and direct the Chief of Staff to the Governor to accept applications for such transfers and institute

processes to affect transfer of qualified applicants as soon as possible, *provided, however, that nothing contained herein shall be construed to authorize or permit the transfer to the stand by reserve of any member of the New York Army National Guard or the New York Air National Guard who did not actually perform such full time duty with their assigned unit because of their absence from such unit for active duty for training.*" (Emphasis in original).

July 10, 1974, amending Executive Order 39 of Governor Rockefeller.

Consideration of the issues raised by this appeal requires some familiarity with Mela v. Callaway, *supra*. *Mela* was an action brought before the issuance of Executive Order 8 by Guardsmen in the same position as appellants herein against the same three defendants (Secretary of the Army, Governor of New York and Commanding General of the Guard) seeking the same relief. In that case Judge Ward held that the plaintiffs there had been on active duty for purposes of § 269(e)(2), that § 269(g) required the Governor's permission for transfer in these circumstances and that Executive Order 39 gave permission for transfer to the Standby Reserve to persons in plaintiffs' position. He concluded that under applicable federal laws and regulations Guardsmen in training when their units are ordered to active duty must for purposes of § 269(e)(2) be deemed to have served as part of their units on active duty.[5] He further reasoned that since Order 39 did not distinguish between Guardsmen in such units who served on active duty in Operation Graphic Hand and those who continued on active duty for training after the call-up, and since no attempt was made to define the status of the latter differently from the federal definition, permission had been given by Governor Rockefeller for the transfer of any Guardsman who met the federal specifications of active duty.[6] Relief was granted in the form of an order preliminarily enjoining the state from requiring the plaintiffs there (all of whom had completed their fifth year in the Guard) to attend drills and annual field training pending the outcome of the action.

A notice of appeal from the *Mela* decision was filed, but the appeal was eventually dismissed for non-prosecution.

In light of the district court's interpretation in *Mela* of the scope of Executive Order 39, the state took steps immedi-

5.   "The Court agrees with plaintiffs' contention that the Proclamation [accompanying Executive Order 39], which recites that certain members of reserve components other than the National Guard are eligible 'by virtue of their service on active duty during the work stoppage, for transfer' to the Standby Reserve and that members of the National Guard are also eligible for transfer to the Standby Reserve 'by virtue of their service during the work stoppage' with the consent of the Governor, and the Executive Order give the requisite consent for the transfer to the Standby Reserve of those members of the National Guard who were serving on active duty for training when their units were called up for active duty.

"The Department of the Army, Office of the Judge Advocate General, has determined that Army Regulation AR135–300 ¶ 2–38; ¶ 2–58(2)f(5); and chapter 3 require that '[r]eservists who were on active duty for training at the time of the postal strike and whose units were ordered to active duty by the Department of the Army are to be considered as having served on active duty so as to qualify for transfer under the provisions of 10 U.S.C. § 269(e)(2).' Significantly, chapter 3 of AR135–300, on which the Department of the Army relied in part in making this determination, applies only to the Army National Guard.

"Although the Department of the Army determination was made subsequent to the Governor's Proclamation and Executive Order, AR135–300 was effective October 1, 1969. This regulation, which appears to deem members of all reserve components on active duty for training to be on active duty to the extent that their units are on active duty, has thus been so interpreted by an official of the Department of the Army, the agency promulgating the regulation. The Governor either knew or should have known of this provision." Mela v. Callaway, *supra*, 378 F.Supp. at 29.

6.   "Furthermore, it is clear from the Proclamation that the Governor's intent in issuing Executive Order No. 39 was to put members of the National Guard on a parity with members of other reserve components. If, in fact, the Governor did not intend that his consent extend to those in plaintiffs' position, after other reservists similarly situated were given the benefits provided in 10 U.S.C. § 269(e)(2), he could have modified the consent given in Executive Order No. 39. This he did not do.

"Instead, the present Governor, through his agent, Brigadier General Francis J. Higgins, now argues that when his predecessor issued Executive Order No. 39 he did not intend that it would apply to those in plaintiffs' position. Such *post hoc* statements made in response to a lawsuit are not persuasive." Mela v. Callaway, *supra*, 378 F.Supp. at 29.

ately after the *Mela* decision to narrow the scope of permission for transfer. On July 10, 1974, Governor Wilson issued Executive Order 8, which amended and superseded Order 39. Consent for members of the Guard to transfer to the Standby Reserve was thereby limited to those who were otherwise qualified and who "actually performed full time duty with their assigned units in the active military service of the United States." The obvious intent was to continue consent for those Guardsmen who had actually helped move the mails to transfer to the Standby Reserve and to deny permission to those in appellants' position who were officially on active duty but had remained in training away from their units.

## DISCUSSION

■ We need not linger long over defendants' threshold contention that federal courts lack jurisdiction over claims asserted by appellants with respect to their status in the Reserve. Appellants have at least made out a colorable claim of denial of equal protection of the laws in violation of the civil rights statutes, 42 U.S.C. § 1983 and 28 U.S.C. § 1343, which is sufficient to invoke federal jurisdiction over the state defendants, by asserting that the state defendants, as the persons in command of appellants, acted arbitrarily and capriciously in de-

nying transfer to those who applied and were qualified for it before July 10, 1974, and that Order 8 attempts to make an illegal distinction among persons who are equal in the eyes of controlling federal law. See Almenares v. Wyman, 453 F.2d 1075 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972). As the district court noted, the relief sought against the federal defendant, Secretary of the Army Callaway, is in the nature of mandamus.

■ Turning to the merits, under Army Regulation AR135–300 ¶ 2–38(b) Reservists (including members of the Guard) who are on active duty *for training* at the time when their units are called to active duty are automatically classified as being on active duty status.[7] "Active duty" in this context denotes a formal status within the military establishment, which is not dependent on the called-up individual's activities while on such duty, as long as the definition encompasses him. Bell v. United States, 366 U.S. 393, 410, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1960). In Hornstein v. Laird, 327 F.Supp. 993 (S.D.N.Y.1971), for instance, Reservists were held to be entitled to transfer under § 269(e)(2) because they had served on active duty status within the definition set out in AR135–300, even though they had been called-up by mistake and immediately sent home upon reporting to their point

---

7. Army Regulation AR135–300 ¶ 2–38(b) provides in pertinent part:

"b. REP-63 [Reserve Enlistment Program of 1963] *members on active duty for training.*

"(1) REP-63 members on active duty for training at the time their units are ordered to active duty and whose training tours will not extend beyond 6 months from the effective date of unit order to active duty will be carried on the Morning Report of the unit to which assigned as absent for the remainder of the period of training. Upon completion of training, members will report for duty to their assigned units. Absence of such members does not create vacancies in the units to which they are regularly assigned. If the unit of assignment has been deployed overseas prior to completion of the members' active duty for training tour,

or if replacement of members is essential to permit the unit to attain readiness for deployment, the members will be reassigned to the training activity at which serving and reported for assignment instructions to the Chief of Personnel Operations, Department of the Army, Washington, DC 20310.

"(2) Commanders of alerted units, will notify direct, by letter, the commanding officer of the installation at which members of their units are serving on active duty for training, inclosing a copy of the orders bringing the unit on active duty. The letter of notification will specify that effective upon the date of unit entry on active duty as shown in the orders, the members concerned will change from an active duty for training to an active duty status. The letter will further indicate whether the members should be returned to the parent unit upon completion of training."

of assembly. In the present case appellants would at least have been required, upon completion of their training, to join their fellow Guardsmen in handling the mails if the postal strike had lasted beyond their tour of training.

In the absence of any indication that the term "active duty" as used in § 269 differs in meaning from that given in Army Regulation AR135–300, and in view of the opinion of the Army Judge Advocate General's Office that the Regulation defining active duty status applies to § 269, see Exhibit A of the Complaint, we adopt that definition here. Since under this interpretation persons on active duty for training assumed active duty status upon the call-up of their units, they satisfy the requirements of § 269(e)(2) for transfer to the Standby Reserve upon completion of five years' service, provided the Governor of the State of New York consents. This consent was given by Governor Rockefeller in Executive Order 39. We are not persuaded that the term "active duty" as used in that Order was intended to exclude persons in appellants' position. In these circumstances the consent must be interpreted as broadly as the meaning of the terms used in giving it, especially when, as Army Regulation AR135–300 ¶ 2–38 reveals, those terms had precise meaning in relevant law when the Order was issued.

Finally, we come to the main issue raised by this appeal—the scope and effectiveness of Executive Order 8, which purported to modify the Governor's prior consent by limiting it to those who actually performed full time duty with their assigned units and making it inapplicable to those absent on active duty for training. In considering Order 8 we must, of course, give deference to the general rule that federal courts will not normally review purely discretionary decisions by military officials which are within their valid jurisdiction. E. g., Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); Smith v. Resor, 406 F.2d 141, 145 (2d Cir. 1969); United States ex rel. Schonbrun v. Commanding Officer, Armed Forces, 403 F.2d 371 (2d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969). However, the military is not free to disregard its own regulations or federal statutes. Where military agencies have established their own procedures and regulations, we have acted to insure that they are followed. See Smith v. Resor, supra; Hammond v. Lenfest, 398 F.2d 705, 710 (2d Cir. 1968). Further, in rare cases a federal court may overturn a discretionary military decision if it is "so arbitrary and irrational that it cannot stand." Feliciano v. Laird, 426 F.2d 424, 427 (2d Cir. 1970).

Defendant state officials argue that the Governor's decision, expressed in Order 8, to deny permission to persons in appellants' position to transfer to the Standby Reserve falls within the area of military discretion and thus cannot be reviewed by this Court except in the two limited circumstances noted above. We need not reach that question, however, because we find that the denial of permission was reasonably based and the Order therefore survives the review which the state defendants seek to avoid.

The Governor was free to change the manner in which he exercised the discretion vested in him by § 269(g). Cf., e. g., Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). In this instance his action was apparently based on the difference in hardship and in disruption of civilian life suffered by Guardsmen already in training as compared to those suddenly called-up to help move the mails. Persons already on active duty for training were unlikely to suffer hardship as a result of the call-up because they were serving in the military full time and were not required to be uprooted. In contrast, those persons called-up from civilian life were in all likelihood required to arrange to leave their jobs and families on extremely short notice and remain away for an indefinite period of time, with probable loss of pay from their civilian jobs. During their tour of

active duty, furthermore, their families were left without a vital member. A distinction based on these differences in hardship is clearly within the discretion vested in the Governor by § 269(g). Furthermore, it bears a reasonable relationship to a legitimate state objective, i. e., relief for those who have suffered hardship in the state military forces, and it does not violate equal protection guarantees. Cf. United States ex rel. Murray v. Owens, 465 F.2d 289, 294 (2d Cir. 1972), cert. denied, 409 U.S. 1117, 93 S.Ct. 930, 34 L.Ed.2d 701 (1973).

In opposition to the distinction made by Order 8 appellants argue that the Governor has unlawfully re-defined their active duty status, in effect determining that they were not on active duty for his purposes. As active duty is a federally defined status, see Bell v. United States, *supra*, 366 U.S. at 410, 81 S.Ct. 1230, 6 L.Ed.2d 365, appellants urge that Order 8 amounts to an impermissible denial of controlling federal law. We disagree. The Governor's Order simply makes a rational distinction between two classes of persons already on active duty status, based on the character of their respective service. Such a distinction does not adversely affect the federal definition of active duty.

■ Although we generally uphold the validity of Order 8, it may not be applied to deny transfer to all appellants. Under § 269(e)(2) National Guardsmen satisfying the requirements of that section who applied for transfer to the Standby Reserve while Order 39 was in force were entitled to have their applications granted, without any right on the part of the defendants to refuse, since the applicants had satisfied all statutory requirements for transfer. See Hornstein v. Laird, *supra*. Whatever discre-

tion existed in the Governor under § 269(g) had been exercised in favor of such applicants. All that remained was the ministerial act of processing the papers. Order 8 is not retroactive. Although the administrative processing of some earlier applications might not have been completed until after Order 8 went into effect the transfers were for all practical purposes completed prior to the effective date of that Order. The necessary paper work to complete applications then pending is not a prerequisite to the granting of the transfers under the law. It is simply an administrative detail, the completion of which this Court may order if it is not accomplished voluntarily. Chapman v. El Paso Natural Gas Co., 92 U.S.App.D.C. 154, 204 F.2d 46, 54 (1953). Otherwise the state defendants could take advantage of their previous illegal refusal to transfer Guardsmen, which would completely nullify any court order requiring transfer based on a general grant of permission such as was issued in *Mela*. Accordingly we hold that appellants who qualified for transfer under § 269(e)(2) before July 10, 1974, and who applied for such transfer before that date, are entitled to transfer. However, since Order 39 was effective only as to those qualified Guardsmen who applied while it was in force, those who failed to apply before it was effectively modified by Order 8 were not entitled to transfer. The stay issued by us on October 17, 1974, is therefore terminated as to appellants who did not apply for transfer until after the date when Order 8 became effective.

The district court's decision is affirmed in part and reversed in part and the case is remanded to the district court for further proceedings not inconsistent with this opinion.